# In the United States District Court
## for the Southern District of Georgia
### Brunswick Division

LATANYA SPRIGGS,          *
                          *
        Plaintiff,        *
                          *
    v.                    *          CV 213-51
                          *
MERCEDES-BENZ USA, LLC,   *
                          *
        Defendant.        *

## ORDER

Presently before the Court is Defendant Mercedes-Benz USA, LLC's ("Defendant") Renewed Motion for Judgment as a Matter of Law. Dkt. No. 118. Defendant filed this Motion after a jury was unable to reach a unanimous verdict in the trial of this case, resulting in a mistrial on November 5, 2015. Dkt. No. 112. For the reasons that follow, Defendant's Motion (dkt. no. 118) is **DENIED**.

### PROCEDURAL BACKGROUND

Plaintiff Latanya Spriggs ("Plaintiff"), a Black female and former employee of Defendant, filed this employment discrimination action against Defendant on October 15, 2012. Dkt. No. 1. In counts one and three of the Complaint, Plaintiff alleges that Defendant discriminated against her in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"), respectively, by treating her differently than White employees and terminating her employment based on her race.  Id. at ¶¶ 31-35, 41-47.  Plaintiff's counts two and four claim that Defendant unlawfully retaliated against her under Title VII and Section 1981, respectively, because it terminated her after she objected to and complained about race discrimination in the workplace. Id. at ¶¶ 36-40, 48-56.  Plaintiff seeks to recover compensatory and punitive damages, as well as attorneys' fees, costs, and expenses.  Id. at ¶¶ (a)-(e).

In an Order dated September 26, 2014, the Court granted in part and denied in part Defendant's Motion for Summary Judgment on all counts.  Dkt. No. 51.  The Court denied summary judgment on Plaintiff's counts one and three, finding that Plaintiff—though having failed to present evidence of similarly situated White employees who were treated differently than her—had put forth "a convincing mosaic of circumstantial evidence" that created a triable jury issue as to whether Defendant fired her with discriminatory intent.  Id. at pp. 1-2, 23-34 (quoting Sims v. MVM, Inc., 704 F.3d 1327, 1333 (11th Cir. 2013)).  As to counts two and four, the Court granted summary judgment in Defendant's favor only to the extent that Plaintiff's retaliation claims were based on allegations that she made

AO 72A
(Rev. 8/82)

written complaints of race discrimination and that Defendant gave false statements about her to prospective employers following her termination. Id. at p. 2. The Court denied summary judgment on the retaliation claims insofar as they allege that Defendant fired Plaintiff for her verbal complaints about workplace discrimination to her managers. Id.

The Court later granted in part and denied in part a Motion in Limine in which Defendant sought to exclude at trial, among other things, evidence relating to allegations of differential and discriminatory treatment. See Dkt. Nos. 88, 98. Relevant here is that the Court denied the portion of Defendant's Motion pertaining to evidence of the following: "1) [m]anagement's alleged refusal to listen to Plaintiff's ideas during management meetings; and 2) [m]anagement's alleged failure to respond to emails or to otherwise communicate with Plaintiff regarding issues pertinent to her job function." Dkt. No. 98, p. 6. The Court reasoned that this alleged mistreatment was the subject of Plaintiff's complaints of discrimination to her supervisor, and that the jury would need to hear the substance of those complaints to determine whether Defendant retaliated against her for engaging in protected speech. Id. at p. 11. The Court also determined that this evidence, when combined with other evidence in this case—in particular, evidence that Plaintiff's supervisor made a comment that management did not like her because she is

AO 72A
(Rev. 8/82)

Black—could add to the "convincing mosaic of circumstantial evidence" from which the jury could infer that Defendant's managers were motivated by racial bias in firing her. Id. at pp. 16-18.

This case proceeded to trial on November 2, 2015. See Dkt. No. 103. During trial, Defendant moved for judgment as a matter of law, and the Court reserved ruling on its Motion at that time. See Dkt. No. 104. The jury ultimately was unable to reach a unanimous verdict, and the Court declared a mistrial on November 5, 2015. See Dkt. No. 112. On December 2, 2015, Defendant filed the instant Motion renewing its request for judgment as a matter of law. Dkt. No. 118. Plaintiff has since responded in opposition to Defendant's Motion, dkt. no. 119, and the Court has scheduled a new trial of this case to begin on May 10, 2016, dkt. no. 128.

## FACTUAL BACKGROUND

The core evidence at trial included the following:

- In 1998, Plaintiff began working at Defendant's vehicle processing center ("VPC") in Maryland. Dkt. Nos. 114-17 ("Trial Tr."), 84-86. Roughly ten years later, Plaintiff's colleague in Maryland, Charles Taylor ("Taylor"), informed her that he was taking a position as Shop Foreman of a new VPC in Brunswick, Georgia. See id. at 92:9-14, 100:5-8, 166:2-24. Taylor told Plaintiff that there would be an

AO 72A
(Rev. 8/82)

opening for a Parts Person to work under his supervision at the Brunswick VPC, and that he wanted Plaintiff to apply for that position. See id. at 91:2-93:11, 166:2-18.

- Plaintiff soon applied for the Parts Person job at the Brunswick VPC. Id. at 93:9-11. She testified at trial that she never had an in-person interview for the Parts Person position—though she could not recall whether she ever interviewed over the telephone—but that she was offered the position in mid-December 2009. Id. at 100:5-8, 101:1-10. Richard Whitmore ("Whitmore"), the Manager of the Brunswick VPC, testified that he, in fact, interviewed Plaintiff and hired her for the position, and that he was aware of her race at that time. Id. at 243:15-17, 410:19-411:8, 411:17-19. Plaintiff moved from Maryland to Georgia and began working at the Brunswick VPC in January 2010. Id. at 100:19-21, 109:1-2.

- As the Parts Person, Plaintiff was primarily responsible for maintaining the inventory of parts that the VPC personnel needed to repair vehicles. Id. at 106:23-107:2. An explicit and essential requirement of this job was to "[c]ommunicate with supervisors and management when problems ar[o]se." Id. at 107:25-108:2. Plaintiff's supervisor was Taylor, the Shop Foreman. Id. at 109:3-16. While Plaintiff reported directly to Taylor, she frequently

needed to interact with Steve Sanfilippo ("Sanfilippo"),
the Warehouse Foreman, regarding contact information and
parts orders. Id. Taylor and Sanfilippo reported to
Richard Gerhardt ("Gerhardt"), the Supervisor of
Operations. Id. at 109:17-21. The only management
position above Gerhardt was Whitmore. Id. at 110:5-15,
243:15-17.

- Whitmore later hired Plaintiff's husband, John Spriggs, Jr.
  ("Mr. Spriggs"), to work at the Brunswick VPC, and he
  continues to work at the facility to this day. Id. at
  412:3-21.

## I. Defendant's Employee Handbook

- Defendant's employee handbook contains a section entitled,
  "Open Door Communications," which states, "Associates are
  encouraged to openly discuss concerns or problems with
  their supervisors so that appropriate action may be taken."
  Id. at 122:1-18.

- The handbook also sets forth a "Diversity Philosophy," as
  well as an "Associate Relations Philosophy" providing that
  "communication is the key underlying factor to ensure these
  values are consistent throughout [the] organization." Id.
  at 123:2-19.

- In another section relating to investigation, the handbook
  reads, "Any reported allegations of harassment,

discrimination or retaliation will be investigated promptly, thoroughly and impartially." Id. at 124:8-14. As to any resulting disciplinary action, the handbook ensures that misconduct "constituting harassment, discrimination or retaliation will be dealt with promptly and appropriately." Id. at 125:2-6.

- The handbook contains a nonretaliation policy, pursuant to which employees are free to share concerns with their supervisors without fear that it will adversely affect the conditions of their employment. Id. at 126:2-12.

## II. Early Communication Issues

- Plaintiff testified at trial that after starting work at the Brunswick VPC in January 2010, she felt that she was being treated differently in the workplace. Id. at 110:19-23. Specifically, Plaintiff stated that she "had issues almost immediately . . . with communication with management." Id. at 108:6-7. She explained that the managers were not giving her the proper information to do her job. Id. at 111:1-2.

- Plaintiff cited one example of a lack of communication involving Sanfilippo. Id. at 111:4-24. According to Plaintiff, Sanfilippo avoided interacting with her and neglected to respond to numerous E-mails from her. Id. at 111:21-24. Consequently, Plaintiff did not know which

parts to order for the line. Id. at 111:12-15. Plaintiff suspected that Sanfilippo treated her in this way because of her race. Id. at 111:5-7.

- When Plaintiff voiced concern about Sanfilippo's lack of communication to her supervisor, Taylor, he assured her that "he would take care of it." Id. at 112:2-9. Plaintiff testified, however, that "[n]othing happened" after her conversation with Taylor; she was still unable to get any communication or information from Sanfilippo. Id. at 112:13-15. Plaintiff then took the issue to Gerhardt, whose attempt to remediate the situation resulted in some interaction from Sanfilippo but only for a brief period of time. Id. at 112:16-25.

## III. Mistreatment at Staff Meetings

- Plaintiff stated at trial that she also was treated differently and made to feel "inferior" during staff meetings. Id. at 113:18-21, 116:16-17. Staff meetings, which occurred monthly from March 2010 up until Plaintiff's termination, provided a forum for certain support staff and management team members to discuss issues at the VPC. Id. at 113:25-114:7, 114:17-24, 115:9-12. Of the nine people who attended these meetings, Plaintiff was the only Black person. Id. at 114:11-14, 115:4-8.

AO 72A
(Rev. 8/82)

- Plaintiff testified that whenever she tried to give an idea or suggestion at staff meetings, Sanfilippo and another employee "would start raising their voices at [her]." Id. at 115:23-116:1. Plaintiff continued, "[I]nstead of Richard Gerhardt intervening and stopping it, he would just glare at me like I was stupid or something and that would go on." Id. at 116:13-15. Plaintiff indicated that on several occasions when she shared ideas, Gerhardt glared at her and "never really said anything"—he "just g[a]ve [her] really dirty looks like whatever [she] said wasn't good enough." Id. at 116:20-117:6.

- Plaintiff approached Gerhardt at some point and explained that she "didn't want to attend [staff meetings] because [she] felt so threatened in the meetings." Id. at 142:15-19. While Gerhardt initially responded that Plaintiff no longer needed to go to the staff meetings, he retracted this statement about one week later. Id. Gerhardt informed Plaintiff that she needed to continue attending the staff meetings, because he "spoke to his colleagues and they told [him] [that] it's a different dynamic with [her] in there." Id. at 142:22-25.

- Nevertheless, Plaintiff detailed another instance that took place at a staff meeting following her conversation with Gerhardt, in which she expressed dissatisfaction with a

9

proposed location for the VPC holiday party, and Sanfilippo and Taylor "yell[ed] at [her] like [she] was stupid." <u>Id.</u> at 141:19-25, 142:6-9. Plaintiff recounted, "I remember just feeling like I was being attacked, just 'you don't know what you're talking about.'" <u>Id.</u> at 141:25-142:2.

- Plaintiff testified that she feels that the managers treated her differently at staff meetings because she is Black. <u>Id.</u> at 142:10-12. When asked whether she ever observed management treating other employees the same way at the meetings, Plaintiff replied, "No, just the opposite. Whenever anybody else would say something, it was like an attaboy, good job, you know, like a shaking -- nodding [the] head up and down like it was a great suggestion[,] and I never got that, ever." <u>Id.</u> at 117:7-13.

## IV. Complaints to Management

- Plaintiff described at trial several discussions that she had with Taylor concerning what she perceived to be race discrimination at the VPC:

> Q:    You recall speaking with Mr. Taylor about discrimination in the workplace?
> A.    I did.
> Q.    And what do you believe, what type of discrimination did you talk to him about?
> A.    Race discrimination.
> Q.    And did you do that more than once?
> A.    Many times.
> Q.    And did he say anything in response to you that you felt confirmed your understanding?
> A.    Oh, he agreed many times.

AO 72A
(Rev. 8/82)

Q. And did he say anything in particular other than agreeing?

A. He actually told me many times that Richard Whitmore and Richard Gerhart both didn't like me because I was [B]lack.

Q. Now, at any time when you spoke with Mr. Taylor about those things, did you ever think about having him do something about this?

A. I don't know if I ever really -- going to your supervisor, I guess I just automatically assume he's going to do something because he is my supervisor and that's his responsibility as my supervisor to do something about it.

Q. And, in fact, to your understanding, did Mr. Taylor do anything about what you perceived as discrimination in the workplace?

A. As far as I know, he did not.

Q. And were you ever interviewed by anyone about how you felt about working in the workplace while you were employed by [Defendant]?

A. No.

Q. Did Mr. Taylor ever ask you to give him specific dates or names of people other than what you told him?

A. No.

Q. Did Mr. Whitmore or [H]uman [R]esources come to you at [the VPC] to talk to you about what you told Mr. Taylor about?

A. No, they did not.

Id. at 136:15-138:1.[1]

---

[1] At trial, Defendant's counsel questioned Plaintiff about her prior deposition testimony regarding Taylor's alleged comment that Whitmore and Gerhardt did not like her because she is Black:

Q. . . . I want to -- okay. "So let me get this straight. Mr. Gerhart -- did Mr. Gerhart and Mr. Whitmore ever directly insult you because of your race?" And your answer there was "Not directly, no"; correct?

A. Correct.

Q. Then [counsel] asked you, at Line 16, "So all the insults you learned from Mr. -- you learned of from Mr. Taylor; is that correct?" And you answered "Yes"; correct?

A. Correct.

Q. And then at Line 19, [counsel] asked "I think one of them was already talked about, you already described to me," and you answered "Yes" at Line 21; correct?

AO 72A
(Rev. 8/82)

- Mr. Spriggs testified at trial that he was present when Taylor told his wife that Whitmore and Gerhardt did not like her because she is Black. _Id._ at 192:4-7. Mr. Spriggs related that Taylor also told him that both Whitmore and Gerhardt are racist. _Id._ at 202:20-22.[2]

---

A.     Correct.
Q.     And then at Line 22, [counsel] asked, "Are there any other, other than that instance," and what was your answer at Line 23?
A.     "Not that I can recall off the top of my head."
Q.     And then at Line 24, [counsel] asked, "So that's the only instance that you recall during your employment with [Defendant] where Mr. Taylor told you something where you were insulted because of your race," and what is your answer at Line 3 on Page 132?
A.     "That I can recall, yes."

Trial Tr. 179:6-180:2.

[2]  Defendant's counsel read the following excerpt from Mr. Spriggs' deposition into evidence at trial:

> [Counsel:] "Were you ever present for any conversations between Mr. Taylor and your wife where management said they didn't like your wife because she's [B]lack?"
>
> .  .  .  .
>
> [Mr. Spriggs:] . . . "I don't remember at this time."
> [Counsel:] "You don't recall that happening at this time?"
> [Mr. Spriggs:] "Not at this time, no.  I will have to think on that."
>
> .  .  .  .
>
> [Counsel:] "Did [Taylor] say Rick Whitmore or has [he] ever told you that he believes Rick Whitmore is a racist?"
> [Mr. Spriggs:] "I don't remember at this time."
> [Counsel:] "Has he ever told you that Richard Gerhart was racist?"
> [Mr. Spriggs:] "No, I don't think he's told me that."

_Id._ at 202:1-8, 204:19-23.  Defendant's counsel then asked Mr. Spriggs at trial to reflect on his deposition testimony:

- Taylor, who also took the stand at trial, denied that Plaintiff ever complained to him about any mistreatment or lack of communication, or that he ever stated that Whitmore and Gerhardt did not like her because she is Black.  Id. at 367:11-369:2.

- Plaintiff, however, maintained that she reported concerns about discrimination to Taylor and, in doing so, relied on the employee handbook policies mandating that allegations of discrimination be investigated promptly and thoroughly and not serve as a basis for retaliation.  Id. at 124:15-17, 126:9-12.  She stated that, to her knowledge, management never conducted any investigation or disciplined any employee in connection with her complaints.  Id. at 124:21-23, 125:16-126:1.  Plaintiff also testified that she believes that the company did not honor its nonretaliation commitment, based on the fact that she was terminated sometime after making these complaints.  Id. at 126:13-17.

---

Q:    . . . . So in 2013 you didn't remember at that time that Mr. Taylor ever told you that Rick Whitmore was racist; correct?
A.    Correct.
Q.    And in 2013, Mr. Taylor had never told you at that point that Richard Gerhart was racist, had he?
A.    No, he hadn't.

Id. at 204:24-205:4.

AO 72A
(Rev. 8/82)

- Plaintiff did not contact or talk to anyone from Defendant's Human Resources department about any discrimination complaints during her employment. Id. at 174:13-15. Plaintiff testified that, based on her understanding of the company policies, she was not required to go to Human Resources to report discrimination and, instead, could go to her direct supervisor with such grievances. Id. at 181:2-6.

- Plaintiff also complained to Gerhardt on one occasion about a coworker making vulgar sexual jokes at company meetings. Id. at 138:16-139:3. Plaintiff explained to Gerhardt that the jokes offended her, and Gerhardt, in Plaintiff's words, "made light of the situation"—"[h]e made it seem like it was okay for [the coworker] to make those jokes." Id. at 139:10-13, 140:8-9. According to Plaintiff, Gerhardt gave no indication that he would take any action to prevent this type of conduct, and no one interviewed her about her complaint at any time. Id. at 140:10-15. When Gerhardt took the stand at trial, however, he testified that he did, in fact, speak with the coworker and interview other employees about the matter. Id. at 276:8-277:5.

## V. Review Meeting and Subsequent Communication Issues

- On October 1, 2010, Taylor met with Plaintiff to deliver and discuss her mid-cycle review, a formal evaluation of

her job performance.  Id. at 129:19-21, 130:20, 131:19-132:3.  Plaintiff testified that Taylor told her during that meeting that he was glad to have her at the VPC, and that she had done "a fantastic job in getting the parts department up and running."  Id. at 132:7-11.  As to the portion of the mid-cycle review relating to "core behaviors," Plaintiff received an "excellent" rating in the area of "execut[ing] decisions and deliver[ing] results."  Id. at 134:20-21, 135:9-14.  According to Plaintiff, Taylor neither criticized her job performance nor mentioned anything about her behavior in the workplace during that meeting.  Id. at 132:4-6, 134:9-12.  Plaintiff left the mid-cycle review meeting believing that she was performing very well in her position.  Id. at 132:24-133:2.

- Plaintiff testified, however, that following the mid-cycle review meeting, Taylor's behavior toward her changed.  Id. at 135:18-22.  Whereas Taylor had previously visited her office daily and been "extremely cordial" to her, Plaintiff stated that his communications with her decreased dramatically just after the meeting.  Id. at 126:24-25, 127:22-24, 135:24-25.  As Plaintiff described it, "[t]he e-mails got less and less[,] and the verbal communication and interaction just got less and less until it just completely stopped."  Id. at 135:25-136:3.  As a result, Plaintiff

15

stated, crucial information that Taylor passed along to all of his employees, such as the scheduling of a meeting, did not reach her unless she happened to overhear another employee discussing it. Id. at 143:8-144:1. It was during this period of time that Taylor allegedly yelled at Plaintiff for commenting on the location of the company holiday party at a staff meeting. Id. at 141:19-21, 142:6-9.

- At some point in time, Gerhardt and Taylor agreed that Gerhardt would take over Taylor's role as Plaintiff's direct supervisor. Id. at 377:15-19, 383:11-13. However, Plaintiff testified that Gerhardt, too, stopped communicating and interacting as much with her after the October 2010 review meeting. Id. at 138:5-6. According to Plaintiff, Gerhardt had visited her area of the facility to speak with her relatively frequently in the past, but he completely avoided her area after the review meeting. Id. at 138:10-12. Plaintiff indicated that whenever she did encounter Gerhardt in the warehouse after the meeting, he passed right by her without speaking. Id. at 138:6-8. When prompted as to the possible reasons for Gerhardt's alleged lack of communication, Plaintiff opined, "I guess I complained too much about discrimination." Id. at 138:13-15.

AO 72A
(Rev. 8/82)

## VI. Counseling Sessions

- Gerhardt testified at trial that he met with Plaintiff multiple times to counsel her regarding her communications or behavior in the workplace. See id. at 275:6-301:8. The first instance occurred after Plaintiff cut her hand while opening a package on April 29, 2010, and Gerhardt assisted her in filling out an incident report for risk management. Id. at 288:15-289:6. According to Gerhardt, Plaintiff continued to raise issues with the form and its contents for months after its submission. Id. at 289:18-291:3. Gerhardt stated that Plaintiff was very upset and claimed that no one else was required to submit this form, and he had to assure her that he followed the same procedure with other individuals. Id. at 289:18-290:5.

- As to his discussions with Plaintiff about Sanfilippo's lack of communication and her coworker's crude jokes at staff meetings, Gerhardt admitted that it was not inappropriate for Plaintiff to raise these concerns to him. Id. at 309:8-10, 316:25-317:2.

- Gerhardt testified that on June 1, 2010, Plaintiff made a general complaint that certain unnamed members of management were unprofessional. Id. at 291:11-18. Gerhardt advised Plaintiff that he could not act on her complaint without further information. Id. at 291:19-23.

17

Gerhardt testified that "that's kind of how it was talking with [Plaintiff;] . . . she would make these general accusations[,] but she wouldn't put any substance behind [them]." Id. at 291:24-292:1.

- Gerhardt testified that, at some unidentified point in time, Plaintiff complained to him about a comment by Whitmore that she found offensive, but she refused to follow Gerhardt's advice to speak with Whitmore and resolve the issue. Id. at 277:24-279:11. Gerhardt also described an instance where two employees complained that they were uncomfortable working with Plaintiff because she gave them attitude. Id. at 280:5-12. He testified that he spoke with Plaintiff upon receiving these complaints and implored her to "take a look at [her] demeanor and behavior" and "work[] on that a little bit." Id. at 280:13-281:6.

- Gerhardt also recalled sending an E-mail to Plaintiff on June 24, 2010, to ask her to look outside of the parts area for trash or any other uncleanliness, and receiving a response from her claiming that he was attacking her work. Id. at 296:15-297:4. Gerhardt stated that Plaintiff made a simple request unnecessarily dramatic by insisting that he was singling her out, and that he had to explain his reasons for the request to her. Id. at 297:4-14, 299:7-11.

AO 72A
(Rev. 8/82)

- On August 11, 2010, Gerhardt and Taylor had to sit down with Plaintiff and another employee with whom she had had a disagreement. Id. at 297:21-298:13. In a follow-up E-mail sent to Plaintiff, the other employee, Taylor, and Whitmore, Gerhardt explained that they had counseled the two that a failure to improve their business relationship could result in disciplinary action. Id. at 319:17-320:9.

- Finally, Gerhardt testified that in November 2010, Taylor came to him with performance- and communication-related concerns about Plaintiff. Id. at 281:11-17. Specifically, Taylor had implemented a new process that required Plaintiff to communicate with the mechanics about the transferring of their parts, and Plaintiff had resisted the change. Id. at 283:16-21. Gerhardt indicated that he and Taylor went to Plaintiff's office, where she continued to dispute Taylor's instruction, and he had to counsel her regarding the need to follow the direction of her immediate supervisor. Id. at 283:16-284:18.[3]

- Gerhardt testified that Plaintiff was neither receptive nor responsive to his counseling on these occasions. See id.

---

[3] Taylor testified that Plaintiff went to Gerhardt on November 18, 2010, to discuss a problem with parts being left on the shelf for extended periods of time. Id. at 394:1-3, 394:24-395:2. Taylor admitted that it was helpful for the parts department that Plaintiff raised this issue. Id. at 394:4-7.

AO 72A
(Rev. 8/82)

at 284:1-6, 295:7-11. He stated that Plaintiff continued to insist that there was nothing wrong with her behavior, and that she was being singled out. Id. at 295:12-14, 299:24-300:1.

- Even so, Gerhardt admitted that he never executed any formal disciplinary document in these instances. Id. at 301:13-16.

## VI. Plaintiff's Termination

- In November 2010, Taylor and Gerhardt recommended to Whitmore that Plaintiff's employment at the VPC be terminated. Id. at 413:18-20. The three then consulted with the company's General Manager and a Human Resources representative regarding the possibility of her termination. Id. at 302:9-10. While Gerhardt and Whitmore described the termination decision at trial as a "collaborative process" and "group decision," the managers agreed that it was Whitmore who made the final decision to terminate Plaintiff's employment. Id. at 302:14-18, 413:15-20. Taylor and Gerhardt met with Plaintiff on November 23, 2010, to inform her of the termination decision. Id. at 144:2-13. Whitmore, who was out of the office on a hunting trip, did not participate in that meeting. Id. at 259:14-21.

- Gerhardt explained the reasons for Plaintiff's termination as follows:

> In November[,] it was just too many things that came to a head. The biggest one was the observation that I had with Charles Taylor where [Plaintiff] was being incredibly resistant to do certain tasks to complete her job.
>
> Seeing that firsthand was an eye-opener for me combined with the fact that I've tried several times to get her to show some initiative to correct her behavior and become part of the team.
>
> I didn't see any effort on her part to turn around, and after seeing how she handled the conversation with Mr. Taylor, I didn't think that we were going to have any chance of turning her behavior around at that point.

Id. at 303:9-20. Gerhardt, Taylor, and Whitmore denied that Plaintiff's race factored into their decision in any way. Id. at 308:6-8, 370:8-10, 413:24-414:1.

- Whitmore testified that at the time of making the termination decision, he was not aware of any disciplinary write-up against Plaintiff. Id. at 259:11-13. While maintaining that counseling or meetings with supervisory staff generally resolves performance or behavior issues, Whitmore conceded that a persistent problem needing heightened personnel action would likely be documented in an employee's file. Id. at 258:18-259:10. Additionally, Whitmore identified only one instance in which he had had a work-related interaction with Plaintiff. Id. at 414:10-15.

AO 72A
(Rev. 8/82)

He further stated that he believed that Taylor was Plaintiff's direct supervisor, and that he would expect to be notified if Gerhardt ever took over for Taylor in this capacity. Id. at 417:19-418:10.

- According to Plaintiff, no one criticized her job performance or her behavior in the workplace prior to her termination. Id. at 144:14-19. Plaintiff recalled, "I just felt like I was terminated because of my -- because I was [B]lack and because I complained too much about the discrimination." Id. at 145:2-4.

- Plaintiff was replaced by a White male. Id. at 272:14-17.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 50 ("Rule 50"), a party may move for judgment as a matter of law at the close of evidence and, if the court does not grant the motion at that time, may renew its motion after the jury returns a verdict or fails to return a verdict on a particular issue. Fed. R. Civ. P. 50(a)-(b). "When a court considers a motion for judgment as a matter of law—even after the jury has rendered a verdict—only the sufficiency of the evidence matters." Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 716 (11th Cir. 2012) (citing Chaney v. City of Orlando, 483 F.3d 1221, 1227 (11th Cir. 2007)). In other words, regardless of whether a court is evaluating such motion before or after the case is submitted to

AO 72A
(Rev. 8/82)

a jury, the question before the court remains the same: "whether the evidence is 'legally sufficient to find for the [nonmoving] party on that issue.'" Chaney, 483 F.3d at 1227 (quoting Fed. R. Civ. P. 50(a)(1); then citing Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004), and Arthur Pew Constr. Co. v. Lipscomb, 965 F.2d 1559, 1563 (11th Cir. 1992)). The court may grant the motion only if "'there is no legally sufficient evidentiary basis for a reasonable jury to find' for the non-moving party." Id. (quoting Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001)).

In reviewing a motion for judgment as a matter of law, a court must consider all of the evidence and draw all reasonable inferences in the nonmoving party's favor. Hubbard, 688 F.3d at 724 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). The court is not to assess the credibility of witnesses or weigh conflicting pieces of evidence at this stage. Id. (citing Reeves, 530 U.S. at 150); Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 715 (11th Cir. 2002) (quoting Lipphardt, 267 F.3d at 1186). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves, 530 U.S. at 150-51 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Accordingly, while the

AO 72A
(Rev. 8/82)

court must review the entire record, "it must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151. That is, it must "give credence to evidence supporting the nonmoving party's case, as well as 'uncontradicted and unimpeached' evidence supporting the moving party, 'at least to the extent that that evidence comes from disinterested witnesses.'" Hubbard, 688 F.3d at 724 (quoting Reeves, 530 U.S. at 151). If reasonable jurors could reach different conclusions about the evidence, the court may not substitute its judgment for that of the jury. Shannon, 292 F.3d at 715 (quoting Lipphardt, 267 F.3d at 1186, and Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000)).

## DISCUSSION

Defendant now moves for judgment as a matter of law on Plaintiff's discrimination claims, arguing that her evidence at trial was insufficient to create the "convincing mosaic of circumstantial evidence" that the Court contemplated in allowing these claims to survive summary judgment. Dkt. No. 118, pp. 5-15. Defendant also contends that Whitmore's role as decision maker in Plaintiff's hiring and firing gives rise to an inference that her race did not factor into her termination, and that Plaintiff failed to put forth evidence at trial to rebut this inference. Id. at pp. 13-14. Additionally, Defendant seeks judgment in its favor on Plaintiff's retaliation claims,

AO 72A
(Rev. 8/82)

based on an alleged absence of evidence supporting the causation element of her prima facie case. Id. at pp. 15–21. Defendant further asserts that in the event that the Court denies its Motion on the foregoing claims, it should nevertheless enter judgment in its favor on Plaintiff's punitive-damages claims at this stage. Id. at pp. 21–23.

In her Response, Plaintiff urges the Court to deny Defendant's Motion in its entirety. Dkt. No. 119. Plaintiff maintains that she introduced sufficient evidence of discrimination at trial, including testimony that (1) Taylor commented that Whitmore and Gerhardt did not like her because she is Black; (2) management mistreated her at staff meetings; and (3) management refused to communicate with her. Id. at pp. 7–12. As to her retaliation claims, Plaintiff cites her complaints about discrimination to Taylor, as well as subsequent communication issues and unwarranted counseling sessions, as circumstantial proof that her termination was, at least in part, retaliatory in nature. Id. at pp. 12–15. Plaintiff further contends that there is sufficient evidence in the record to allow her punitive-damages claim to go to a jury. Id. at pp. 15–17.

AO 72A
(Rev. 8/82)

**I. Plaintiff's Race Discrimination Claims (Counts One and Three)**

Title VII makes it unlawful for an employer to discriminate on the basis of color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Section 1981, which provides that all persons in the United States "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by [W]hite citizens," likewise prohibits discrimination in the workplace. Addison v. Ingles Mkts., Inc., 515 Fed. App'x. 840, 841-42 (11th Cir. 2013) (quoting 42 U.S.C. § 1981). Race discrimination claims under Title VII and Section 1981 "have the same requirements of proof and the same analytical framework." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

"A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or statistical proof." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010) (quoting Rioux v. City of Atlanta, 520 F.3d 1269, 1274 (11th Cir. 2008)). A plaintiff who bases her discrimination claim on circumstantial evidence may satisfy her burden of proof in one of two ways: First, she may rely on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under McDonnell Douglas, the plaintiff must make a prima facie showing

AO 72A
(Rev. 8/82)

that she (1) belongs to a racial minority; (2) was subjected to an adverse employment action; (3) was treated less favorably than similarly situated, nonminority employees; and (4) was qualified for the job. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing McDonnell Douglas Corp., 411 U.S. at 802; Coutu v. Martin Cty. Bd. of Cty. Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995); and Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1060 (11th Cir. 1994)). The burden shifts then to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802. If the defendant is able to do so, the plaintiff "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citing McDonnell Douglas Corp., 411 U.S. at 804).

Second, and in the alternative, the plaintiff may present circumstantial evidence other than evidence of comparators "that creates a triable issue concerning the employer's discriminatory intent." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (citing Holifield, 115 F.3d at 1562, and Silverman v. Bd. of Educ., 637 F.3d 729, 733 (7th Cir. 2011)). "A triable issue of fact exists if the record, viewed in a light

AO 72A
(Rev. 8/82)

most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision[]maker.'" Id. (footnote omitted) (quoting Silverman, 637 F.3d at 734).

A "convincing mosaic of circumstantial evidence" may include, for example, "circumstantial evidence that the employer's offered justification for an adverse employment action is pretextual." See, e.g., id. at 1341 (citing Silverman, 637 F.3d at 734); see also Reeves, 530 U.S. at 147 ("'[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.' . . . . Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." (emphasis removed) (citation omitted) (first quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); then citing id. at 517)). The "convincing mosaic" also may be comprised of proof that the defendant "consciously injected race considerations into its . . . decision making without an adequate explanation for doing so." See, e.g., Smith, 644 F.3d at 1341. Other evidence lending support to this showing may include proof that the defendant "was particularly concerned with race" and "circumstantial evidence connect[ing] [the] employee's race to the employer's decision[] making." See

AO 72A
(Rev. 8/82)

Connor v. Bell Microproducts-Future Tech, Inc., 492 F. App'x 963, 967 n.1 (11th Cir. 2012) (citing Smith, 644 F.3d at 1327–47).

Plaintiff in this case has attempted to prove intentional discrimination not through comparator evidence but rather through a "convincing mosaic" of other circumstantial evidence. As Plaintiff has put forth several pieces of circumstantial evidence that, when taken together, could reasonably permit a jury to infer discriminatory intent in Defendant's termination decision, Plaintiff has succeeded in creating a triable jury issue.

**A. Taylor's Comment**

The first and most significant component of this constellation of circumstantial evidence is Taylor's comment that Whitmore and Gerhardt did not like Plaintiff because she is Black. See, e.g., Trial Tr. 137:3-4. At trial, Plaintiff testified that Taylor made this comment to her "many times" during their conversations about what she perceived to be discrimination in the workplace. Id. at 136:15-137:4. When Mr. Spriggs took the stand, he confirmed that he was present on one occasion when Taylor made this statement to his wife. Id. at 192:4-7. Mr. Spriggs also indicated that Taylor told him that both Whitmore and Gerhardt are racists. Id. at 202:20-22.

AO 72A
(Rev. 8/82)

Defendant seeks to have the Court disregard this evidence, arguing that both Plaintiff's and her husband's statements at trial "materially contradicted" their prior deposition testimony. Dkt. No. 18, pp. 6-8 (citing Johnson v. Fay Portable Bldgs., Inc., No. 3:02-CV-173, 2003 U.S. Dist. LEXIS 20905, at *19-28 (E.D. Tenn. Nov. 4, 2003) (denying the defendant's motion for a new trial, in part because "substantial contradictions" between the deposition and trial testimonies of its key witnesses supported a finding "that [they had] lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions" (quoting Hall v. Consol. Freightways Corp., 337 F.3d 669, 675 (6th Cir. 2003)))). Defendant's argument is unavailing, as these witnesses' accounts at trial were not substantially inconsistent with those given earlier in litigation: Plaintiff represented at her deposition that Taylor's comment was "the only instance" in which he told her something insulting about her race "that [she] [could] recall off the top of [her] head." Trial Tr. 179:6-180:2. Plaintiff's statement at trial that Taylor made this comment "many times," see id. at 137:3-4, was in accord with the basic message of her deposition testimony (i.e., that Taylor made this comment to her). Moreover, it is unclear whether the use of the term "instance" at the deposition was in reference to one "occasion," as opposed to one "example," of a race-related comment from

30

Taylor—the latter of which would not speak to the number of occurrences of this statement and thus would not create any conflict with Plaintiff's trial testimony. See *Instance*, Merriam Webster, http://www.merriam-webster.com/dictionary/instance (last visited Apr. 20, 2016). However, even construing Plaintiff's deposition testimony as referencing only a single "occasion" on which Taylor made this comment, it was not contradictory for Plaintiff to supplement her well-expressed limited recollection at the deposition with details concerning additional instances of this statement at trial.

Mr. Spriggs indicated at his deposition that he could not remember whether he was present for any conversation in which Taylor stated that the managers did not like his wife because she is Black, or whether Taylor ever told him that Whitmore is racist. Trial Tr. 202:1-8, 204:19-21. Mr. Spriggs' representations at trial that he heard Taylor make these statements, see id. at 192:4-7, 202:20-22, did not necessarily contradict his prior inability to recall these facts at his deposition. Insofar as Mr. Spriggs also suggested at his deposition that Taylor never said that Gerhardt is racist, and later gave a contrary implication at trial, see id. at 202:20-22, 204:19-205:4, the extent to which such possible inconsistency impacts the credibility of this witness or the

weight of this evidence is for a jury, not the Court, to decide, in any event.

Thus, taking into account Plaintiff's and her husband's testimonies, Plaintiff has offered sufficient evidence of Taylor's comment as circumstantial proof of intentional discrimination. Significantly, the alleged comment came from Plaintiff's supervisor—a manager at the VPC—and it specifically and directly related to Plaintiff and the circumstances of her employment. See, e.g., id. at 137:3-4. Moreover, the employees to whom Taylor allegedly attributed discriminatory animus, Whitmore and Gerhardt, played key roles in recommending, evaluating, and rendering a final decision on Plaintiff's discharge. Id. at 302:9-10, 302:14-18, 413:15-20; cf. Beckles v. Fed. Express Corp., 489 F. App'x 380, 385 (11th Cir. 2012) (evidence that other employees had accused management of making racial remarks in the past did not create an inference of intentional discrimination, because it was "so vague and unrelated to [the plaintiff's] termination"). From this evidence, a reasonable jury could infer that the proffered justification for Plaintiff's termination (i.e., performance and behavioral issues) is pretextual, and that Whitmore and Gerhardt instead were concerned with Plaintiff's race and injected this consideration into their termination decision.

AO 72A
(Rev. 8/82)

## B. Refusal to Communicate or Investigate

Second, Plaintiff has offered evidence that management refused to communicate with her because of her race and failed to investigate her complaints. Plaintiff demonstrated at trial that communication is an explicit component of the Parts Person job description, and that Defendant's employee handbook not only emphasizes the importance of communication for all employees but also ensures that reports of discrimination or harassment will result in a thorough investigation and appropriate disciplinary action. Trial Tr., 107:25-108:2, 122:1-18, 123:2-19, 124:8-14, 125:2-6. Plaintiff testified that she had communication issues with management almost immediately upon beginning work at the Brunswick VPC—in particular, that Sanfilippo treated her differently than other employees by failing to provide her with information that she needed to do her job, which she felt was because of her race. Id. at 108:6-7, 110:19-23, 111:5-7, 111:12-15. Plaintiff indicated that when she told Taylor and Gerhardt about Sanfilippo's alleged lack of communication, they either took no remedial action or took remedial action that ultimately proved futile. Id. at 112:2-25. Additionally, Plaintiff described another instance in which she reported a coworker's offensive jokes to Gerhardt, only to receive a flippant response and never be interviewed or otherwise involved in any investigation into the matter. Id. at 138:16-139:3,

33

139:10-13, 140:8-15.  Plaintiff further testified that Taylor
and Gerhardt never gave any indication that she had performance
or behavioral issues sufficiently severe as to threaten her
continued employment, and that they stopped communicating with
her entirely after the October 2010 review meeting.  See id. at
135:25-136:3, 138:5-6, 144:14-19.

Defendant urges the Court not to consider this evidence,
because Plaintiff did not sufficiently state or explain how each
employee's alleged failure to act was based on her race and how
it led to her termination.  See Dkt. No. 118, pp. 8-10.
Defendant's argument in unavailing, as it is enough, at this
stage, that Plaintiff's testimony permits an inference of
discriminatory conduct.  A jury could reasonably find that
management's departure from the company communication and
investigation policies only when dealing with Plaintiff
exhibited racial bias.  Evidence that Taylor commented that
certain of these managers disliked Plaintiff because of her
race, see Trial Tr., 137:3-4, would strengthen this inference.
Further, a jury could conclude that management withheld
important information from her and neglected to investigate her
legitimate workplace concerns, so that she would fail in her
position and be terminated.  Alternatively, a jury could infer
from management's silence as to severe performance or behavioral
issues that such issues did not, in fact, exist and are merely

34

pretext for the managers' decision to summarily fire her based
on her race.

### C. Mistreatment at Staff Meetings

Third, Plaintiff has introduced evidence that management
treated her differently than White employees at staff meetings.
Plaintiff testified that Sanfilippo and Taylor yelled at her as
if she was stupid when she gave suggestions at the meetings, and
that Gerhardt did nothing to intervene in these instances. Id.
at 115:23-116:1, 116:13-15, 141:19-25, 142:6-9. Plaintiff also
indicated that Gerhardt glared at her and made her feel inferior
whenever she gave input. Id. at 116:20-117:6. Plaintiff
testified that she believed that the managers treated her in
this manner because of her race, reasoning that she was the only
Black person of the nine employees at these meetings, and that
the managers did not exhibit these behaviors toward the other
employees. Id. at 114:11-14, 115:4-8, 117:7-13, 142:10-12. To
the contrary, Plaintiff described the managers' response to
other employees' suggestions as "an attaboy, good job, you know,
like a shaking -- nodding [the] head up and down like it was a
great suggestion." Id. at 117:7-13.

Defendant's arguments that Plaintiff's testimony in this
regard is speculative and fails to connect the alleged
mistreatment at staff meetings to her race and termination, see
dkt. no. 118, pp. 11-13, fail for the same reasons discussed in

35

the previous subsection.  See supra Subpart I.B.  Defendant

further contends that Plaintiff's testimony is "illogical" and

"isn't credible" based on evidence that Taylor recommended her

for the Parts Person position and openly discussed

discrimination issues with her, as well as evidence that

Gerhardt insisted upon her continued attendance at staff

meetings at the request of her colleagues.  Dkt. No. 118, p. 13.

Whether the evidence cited by Defendant undermines Plaintiff's

credibility, and whether it creates an inference in favor of

Defendant that is strong enough to outweigh any competing

inference in Plaintiff's favor, are questions for a jury, and

not for the Court on a Rule 50 motion.

A jury could reasonably infer from the circumstances to

which Plaintiff testified that management treated or allowed

others to treat her with hostility at staff meetings based on

her race.  When coupled with Taylor's comment that Whitmore and

Gerhardt did not like Plaintiff because she is Black, Trial Tr.,

137:3-4, the fact that Plaintiff was the only Black person at

the staff meetings and had no other distinguishing features from

the other staff members could suggest that management's negative

attitude toward only her at these meetings was based on her

race.  A jury could find that this evidence offers further

support for the conclusion that management was motivated by

AO 72A
(Rev. 8/82)

racial animus, rather than performance- and behavior-based concerns, in discharging Plaintiff.

### D. "Same Decision Maker" Inference

The "same decision maker" inference does not change this result. See Williams v. Vitro Servs. Corp., 144 F.3d 1438, 1442 (11th Cir. 1998) ("[W]here the facts indicate that the same individual both hired and fired an employee, an inference may arise that the employers' stated justification for terminating the employee is not pretextual." (citing Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991))). As an initial matter, whether the "same decision maker" inference even applies to Plaintiff's termination is for a jury to decide. See id. at 1443 (explaining that the inference is permissive, not mandatory, and that its application in a given case is a decision entrusted to the jury's discretion).

The Court cannot conclude at this time that a jury would unequivocally apply the inference in this case. While Whitmore testified that he hired Plaintiff and made the final decision as to her termination, Plaintiff has introduced evidence undermining his role as decision maker on the latter occasion, including testimony that (1) Taylor and Gerhardt recommended her termination; (2) Whitmore did not know that Gerhardt had taken over primary supervision of Plaintiff's work; (3) Whitmore was not aware of any disciplinary write-ups against Plaintiff and

had had only one work-related interaction with her; (4) the managers engaged in a "collaborative process" and made a "group decision" to terminate her employment; and (5) Taylor and Gerhardt conducted the meeting to inform her of her termination while Whitmore was away on a hunting trip.  Trial Tr., 144:2-13, 259:11-21, 302:14-18, 413:15-20, 414:10-15, 417:19-418:10. Thus, for the purposes of this Motion, Defendant cannot rely on the "same decision maker" inference to overcome Plaintiff's "convincing mosaic of circumstantial evidence" of intentional discrimination.  Defendant's Motion for judgment as a matter of law on Plaintiff's discrimination claims is, therefore, **DENIED**.

## II.  Plaintiff's Retaliation Claims (Counts Two and Four)

An employer may not retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . , or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" regarding such practice.  Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 956 (11th Cir. 1997) (quoting 42 U.S.C. § 2000e-3(a)).  To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was a causal link between these two events.  Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1212-13 (11th Cir. 2008).  Once a plaintiff makes

AO 72A
(Rev. 8/82)

this showing, the burden shifts to the employer-defendant "to articulate a legitimate, nondiscriminatory reason" for the adverse employment action. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010) (citing Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002)). If the defendant is able to do so, then the burden shifts back to the plaintiff to offer evidence that the defendant's proffered reason "is a pretext for illegal discrimination." Id. (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004)).

In the instant matter, Defendant's Motion does not challenge Plaintiff's evidence that she engaged in a protected activity in complaining about discrimination to Taylor, and that she suffered an adverse employment action when she was terminated. See Trial Tr., 136:15-138:1, 144:2-13. While Defendant disputes Plaintiff's evidence of a causal link between these events, see dkt. no. 118, pp. 16-21, the Court finds that Plaintiff has come forward with sufficient causation evidence to support a jury verdict in her favor on her retaliation claims.

The Court of Appeals for the Eleventh Circuit broadly construes the causal-link element: "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Smith v. Metro. Sec. Servs., Inc., 537 F. App'x 864, 867 (11th Cir. 2013) (quoting Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1278 (11th Cir.

AO 72A
(Rev. 8/82)

2008)). A plaintiff satisfies this standard by showing "that the decision maker was aware of the protected conduct at the time of the adverse employment action." Id. (quoting Goldsmith, 513 F.3d at 1278). While awareness of the protected conduct may be demonstrated by circumstantial evidence, a plaintiff must put forth "more evidence than mere curious timing coupled with speculative theories." Id. at 868 (quoting Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997)). In the absence of additional evidence, temporal proximity between the statutorily protected activity and the adverse employment action must be "very close" for a plaintiff to meet her burden of establishing causation. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).

At trial, Plaintiff put forth evidence from which a jury could conclude that she was terminated because of her complaints about discrimination to Taylor. Plaintiff testified that she went to Taylor several times to report what she viewed as discriminatory conduct in the workplace, and both she and her husband described conversations with Taylor relating to such conduct on the part of Whitmore and Gerhardt in particular. Trial Tr., 136:15–138:1, 192:4–7, 202:20–22. The evidence at trial also demonstrated that Taylor, in turn, reported directly to Gerhardt, and that Whitmore was the only manager superior to

40

Gerhardt at the VPC. Id. at 109:17-21, 110:5-15, 243:15-17.
Plaintiff testified that both Taylor and Gerhardt stopped
communicating with her in early October 2010, which negatively
impacted her job performance, and all three managers admitted to
taking part in the decision to terminate her employment. Id. at
135:25-136:3, 138:5-6, 302:9-10. Plaintiff also expressed her
belief that the managers violated Defendant's nonretaliation
policy by firing her after she "complained too much about the
discrimination." Id. at 124:15-17, 126:2-17.

Defendant emphasizes that Plaintiff did not offer any
evidence at trial that Whitmore was aware of her alleged
discrimination complaints to Taylor. See Dkt. No. 118, p. 17.
Plaintiff need not make such a showing, as the evidence
demonstrates that at least one manager directly involved in the
termination decision, Taylor, was aware of these complaints, and
even goes so far as to illustrate a chain of command through
which Taylor and Whitmore may have received notice of this
information. See id. at 109:17-21, 110:5-15, 136:15-138:1,
192:4-7, 202:20-22, 243:15-17. Defendant also highlights a lack
of evidence that Whitmore, Gerhardt, Taylor, or the other two
individuals participating in the termination discussions
actually considered these complaints. See Dkt. No. 118, p. 17.
This argument also lacks merit, as Plaintiff need only put forth
evidence that management was aware of her complaints when they

41

had those discussions to make a prima facie showing of causation.

While Defendant offered testimony at trial that Plaintiff was discharged based on poor performance and behavior, see id. at 303:9-20, Plaintiff countered with evidence suggesting that this justification is pretextual. Specifically, Plaintiff introduced evidence that Gerhardt used her legitimate reports about personnel and product-line concerns as opportunities to "counsel" her in some instances. See id. at 309:8-10, 316:25-317:2, 394:1-3, 394:24-395:2 (Plaintiff's complaints regarding Sanfilippo's lack of communication, her coworker's offensive jokes, and issues with parts being left on the shelf were appropriate and helpful). Plaintiff also showed that none of the situations resulting in a counseling session was severe enough to warrant a disciplinary write-up or any other formal documentation. Id. at 258:18-259:10, 301:13-16. Because the Court cannot conclude that there is no legally sufficient basis to find that Defendant's managers retaliated against Plaintiff based on her discrimination complaints, judgment as a matter of law is inappropriate. This portion of Defendant's Motion is **DENIED.**

## III. Plaintiff's Claims for Punitive Damages

Punitive damages are available in employment discrimination cases only where the employer-defendant has intentionally

AO 72A
(Rev. 8/82)

discriminated against the plaintiff "with malice or with reckless indifference to [her] federally protected rights." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 534 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). To create a triable jury issue regarding punitive damages, the plaintiff must put forth "substantial evidence" that the defendant acted with actual malice or with reckless indifference to her federally protected rights. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1280 (11th Cir. 2002) (citing Kolstad, 527 U.S. at 536-37). "Malice or reckless indifference is established by a showing that the employer discriminated in the face of the knowledge that its actions would violate federal law." Id. (citing Kolstad, 527 U.S. at 536). Examples of conduct egregious enough to satisfy this standard include "(1) a pattern of discrimination, (2) spite or malevolence, or (3) a blatant disregard for civil obligations." Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317, 1322-23 (11th Cir. 1999)).

While the record in this case reflects that Defendant has policies in place to ensure lawful employment practices, Plaintiff's evidence that such policies are ineffective allows an inference that Defendant acted with reckless disregard to her federal rights under Title VII and Section 1981. Compare Jackson v. Checkers Drive-In Rests., Inc., No. 8:10-CV-1483-T-26TBM, 2011 WL 3171812, at *4 (M.D. Fla. July 27, 2011)

AO 72A
(Rev. 8/82)

(defendant not liable for punitive damages where it has made "good-faith efforts" to comply with federal law through written policies prohibiting discrimination and procedures for reporting the same (citing Kolstad, 527 U.S. at 544)), with Goldsmith, 513 F.3d at 1281-82 (upholding punitive-damages award where defendant's management failed to follow antidiscrimination policy and investigate discrimination complaints, demonstrating ineffectiveness of policy and reckless indifference to employee's rights). Defendant's handbook contains an antidiscrimination policy, as well as open-door communications and nonretaliation policies encouraging the reporting of discriminatory conduct. Trial Tr., 122:1-18, 123:2-19, 124:8-14, 125:2-6, 126:2-12. Nevertheless, Plaintiff put up evidence at trial from which a jury could reasonably infer that Defendant did not make good-faith efforts to enforce these policies: (1) Plaintiff made multiple complaints about discrimination in the workplace to her supervisor; (2) her supervisor allegedly told her that management did not like her because of her race; (3) she continued to be subjected to hostile, less favorable treatment by management, particularly after the October 2010 review meeting; (4) there was no investigation into her discrimination complaints; and (5) management did not take disciplinary action or otherwise make any effort to cease the allegedly discriminatory acts. See, e.g., id. at 135:25-136:3,

44

136:15-138:1, 138:5-6. Because reasonable jurors could differ as to whether Defendant, through its management, engaged in a pattern of discrimination or blatant disregard at the Brunswick VPC, Defendant's Motion for judgment in its favor on the punitive-damages claims is **DENIED**.

## CONCLUSION

In light of the foregoing, Defendant's Renewed Motion for Judgment as a Matter of Law (dkt. no. 118) is **DENIED** in its entirety. This case will proceed to a retrial as scheduled.

**SO ORDERED**, this 26TH day of April, 2016.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)